IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 6, 2005 Session

**STATE OF TENNESSEE V. ABBIGAIL MORTON**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-08490     W. Fred Axley, Judge**

---

**No. W2005-00308-CCA-R3-CD  - Filed April 5, 2006**

---

Following a jury trial, Defendant, Abbigail Morton, was convicted of one count of attempted premeditated first degree murder and one count of conspiracy to commit premeditated first degree murder. The trial court sentenced Defendant as a Range I, standard offender, to concurrent sentences of twenty years for each conviction. In her appeal, Defendant argues that (1) the testimony of the co-defendant, Robert Hunter, was insufficiently corroborated to support Defendant's convictions; (2) the evidence was insufficient to support her convictions; (3) the trial court erred in not instructing the jury on the lesser included offense of solicitation of first degree murder; and (4) the trial court erred in not sentencing Defendant as an especially mitigated offender. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Charles E. Waldman, Memphis, Tennessee, for the appellant, Abbigail Morton.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Tracye N. Jones, Assistant District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Background**

Richard Morton, Defendant's husband, testified that Defendant drove him to the Regional Medical Center in Memphis on April 29, 2003, for a surgical procedure necessitated by a gunshot wound he had received on December 2, 2002. Mr. Morton stated that Defendant stayed with him after the surgery until late afternoon when she left the hospital to return home.

Mr. Morton said that he was lying on his right side because an I.V. needle was in his left hand. After Defendant left, an African-American man wearing a suit, who was later identified as Mr. Hunter, came into his room. Mr. Morton rolled over, looked at Mr. Hunter, and rolled back again on to his right side. He then rolled over a second time and saw Mr. Hunter bending over him with a syringe in his hand. Mr. Morton said he felt a "burning, stinging sensation" in his hand and screamed. Mr. Hunter ran out of the hospital room, and Mr. Morton pulled the I.V. needle out of his hand. A nurse responded to his cries. Mr. Morton said that he was not diabetic and had never taken insulin. Mr. Morton acknowledged that he had taken pain medication following the surgery.

Mr. Morton said that he had seen Mr. Hunter prior to the incident at Mr. Morton's grocery store. Mr. Hunter had asked Mr. Morton about Mr. Morton's son, Jeremy, because Jeremy Morton was dating Mr. Hunter's stepdaughter. Mr. Morton said that there were no bad feelings between the two men because Mr. Morton did not know Mr. Hunter outside of this context.

Mr. Morton said he had three life insurance policies totaling about $196,000. Defendant and her two sons were the beneficiaries of the policy.

On cross-examination, Mr. Morton said that his hospital room was located across from the nurses' station, but no one could see inside his room because of the placement of the door. Mr. Morton said he had no reason to believe that Defendant was angry with him, and the couple did not have any arguments or financial difficulties.

Ms. Vicki Patton, a registered nurse with the Regional Medical Center, was preparing for the change in shifts at approximately 6:45 p.m. on the fifth floor when she heard Mr. Morton scream from Room D512 that he had been "shot" in his I.V. Mr. Morton told Ms. Patton that the man who had injected something into his I.V. was wearing a gray suit, brown shoes, and a hat. Ms. Patton instructed her secretary to call security. A hospital visitor told Ms. Patton that he saw a man run toward the stairwell. Ms. Patton rode the elevator down to the first floor and exited the hospital on Jefferson Street. Ms. Patton stood watching the people on the street for a few minutes and then spotted a man matching Mr. Morton's description. Ms. Patton pointed the man out to Officer Jowa Horn, a security guard with the hospital. A second security officer approached the man from the opposite direction, and the man began running.

On cross-examination, Ms. Patton said that she had seen Defendant in Mr. Morton's hospital room before the incident, and she had not noticed anything out of the ordinary.

W. I. Garrett, a security officer with the hospital, found two syringes in Mr. Hunter's coat pocket when he was searched after his detention. Mary Laughlin, the assistant director of the Regional Medical Center Pharmacy, tested Mr. Morton's I.V. bag with a refractometer for controlled substances but not did not detect any drugs. Mr. Hunter told Ms. Laughlin that he did not inject any controlled substances into Mr. Morton's I.V. bag. Sergeant Daniel Parris, with the Memphis Police Department, placed the syringes found in Mr. Hunter's coat and Mr. Morton's I.V. bag in the

morgue's refrigerator for storage. Subsequent tests performed on the contents of Mr. Morton's I.V. tested negative for heavy metals such as arsenic, cadmium and lead, and negative for cyanide.

Dr. Tiffany Bee, a trauma and general surgeon at the Regional Medical Center, testified that Mr. Morton's vital signs, including his blood sugar levels, were stable immediately after surgery, and there was no indication in his medical records that he was diabetic. After surgery, Mr. Morton was given an I.V. solution consisting of five percent dextrose, five percent normal saline, and a small amount of potassium.

Mr. Morton's blood sugar level at 7:31 p.m., shortly after the incident, was 76. Dr. Bee said that Mr. Morton's blood sugar level was in the normal range for a surgical patient who had not eaten in awhile. Mr. Morton's blood sugar level, however, was 46 at 8:13 p.m,. which was abnormally low, and he was given a dextrose I.V. solution. He was given another I.V. solution at 9:24 p.m. because his blood sugar level was 43. At 9:34 p.m., his blood sugar level had risen to 213 as a result of the two I.V. treatments, but had fallen again to 45 by 10:37 p.m. Dr. Bee said that Mr. Morton's blood sugar levels continued to fluctuate until 11:32 p.m. when he began to consistently maintain a blood sugar level within the normal range. Dr. Bee testified that the drop in Mr. Morton's blood sugar was characteristic of receiving an injection of insulin. Dr. Bee said that severely low blood sugar levels can lead to coma and ultimately death.

On cross-examination, Dr. Bee said that a patient's blood sugar level should not drop below 70 after surgery. Dr. Bee said that Mr. Morton was given six milligrams of morphine at 3:15 p.m., and acknowledged that an adverse reaction to morphine can cause hallucinations. Dr. Bee said that she was not an endocrinologist and could not rule out every cause for the drop in Mr. Morton's blood sugar levels, but she reiterated that the event was very "irregular" for this patient based on his medical history.

Rose Marie Bee said that she was the secretary for Jonestown Elementary School where Mr. Hunter was principal at the time of the offenses. She testified that Defendant met with Mr. Hunter at the school in the spring of 2002, and again in February, 2003. Mr. Hunter told Ms. Bee that he and Defendant were seeing each other. After one of Defendant's visits, Mr. Hunter introduced Defendant to Ms. Bee as "Mrs. Adams." Ms. Bee stated on cross-examination that Defendant called the school so frequently that Ms. Bee recognized her voice.

Robert Hunter testified that he was the principal of Jonestown Elementary School in Jonestown, Mississippi, at the time of the offenses. Mr. Hunter said that he had also been trained as a nurse's assistant. Mr. Hunter said that he first met Defendant on May 3, 2002, at a high school athletic banquet. Defendant was seated across the table from Mr. Hunter during dinner. Mr. Hunter said that he started to leave at one point, and Defendant passed him a note asking him to stay a little longer. Eventually, however, Mr. Hunter left without conversing with Defendant.

Mr. Hunter said he saw Defendant a few days later at a program at the Jonestown Elementary School. Mr. Hunter spoke with Defendant a few minutes and asked her at one point during their

conversation if Defendant was married. When Defendant told him she was married, Mr. Hunter said he told Defendant "in a flirting mode" that he could send her husband to the Bahamas or "on a permanent vacation." Defendant and Mr. Hunter exchanged telephone numbers.

Mr. Hunter said he called Defendant on May 11, 2002, and made arrangements to meet her the next day. Mr. Hunter and Defendant rode around in Mr. Hunter's car on May 12, 2002, and talked. Mr. Hunter said he did not want to be seen with Defendant because he was living with his fiancee, Audrey Walker, at the time. On one occasion, however, Mr. Hunter and Defendant were at the Gold Strike Casino when Ms. Walker walked up and confronted him about being with Defendant. Eventually, Mr. Hunter's relationship with Defendant became sexual. Mr. Hunter said that on one occasion, he and Defendant were able to meet at an apartment of one of Defendant's friends who was in the hospital.

Mr. Hunter said that Defendant first brought up the idea of killing her husband in June 2002. Defendant reminded Mr. Hunter of his previous statement that he could send her husband on a permanent vacation and told Mr. Hunter that she would like "to send him away permanently." Mr. Hunter said he thought Defendant was joking at the time.

Mr. Hunter said Defendant brought up the subject of killing her husband often over the next few months until Mr. Hunter was convinced that she was serious. Mr. Hunter suggested to Defendant that they limit their conversations and meetings if she was serious about carrying out her plan. Mr. Hunter also told Defendant that "contract killings are expensive," and he wanted proof that Defendant could pay for his services.

In late September or early October, Mr. Hunter said that he asked Defendant to show him the insurance policies on her husband. Mr. Hunter agreed to meet Defendant in Marks, Mississippi. Defendant showed up for their assignation with an unknown male who was driving a car with an Illinois license plate. Mr. Hunter said that Defendant's conduct made him wary of a set-up, but he still examined the insurance policy which Defendant had brought. Mr. Hunter said the insurance policy had a face value of $100,000, with Mr. Morton listed as the insured. Mr. Hunter said that he told Defendant it would cost her between $30,000 and $38,000 to hire him to kill her husband. Mr. Hunter said he based his pricing for the job on the contingency fee schedule used by attorneys.

Mr. Hunter said that he and Defendant were not having sexual relations by this time. Mr. Hunter said that he initially did not want to participate in Defendant's plan to kill her husband, but Defendant was very persistent. Mr. Hunter explained that he eventually "convinced [himself] in [his] mind, that after listening to her, it was okay." After Mr. Morton was shot in December 2002 and suffering from medical problems, Mr. Hunter suggested that they use insulin to kill Mr. Morton instead of one of the more violent alternatives advocated by Defendant. Mr. Hunter said that one of Defendant's suggestions involved shooting Mr. Morton in "a bad crime area." Another plan involved luring Mr. Morton to Arkansas to see a friend and shooting him at some point during the trip.

Mr. Hunter said Defendant called him in April 2003, and said she had "good news." Defendant told Mr. Hunter that her husband was going to have a surgical procedure in Memphis. Defendant and Mr. Hunter met in Clarksdale on April 24, 2003, to coordinate their plans because Mr. Hunter's fiancee was also having surgery in DeSoto County, Mississippi, on the same day as Mr. Morton. Mr. Hunter called a friend who had diabetes and asked for some insulin. He picked the insulin up on April 25, 2003.

On April 29, 2003, Mr. Hunter waited until after Ms. Walker was in recovery following her surgery before driving to the Regional Medical Center in Memphis. He called Defendant to let her know he was on his way. Defendant met him on the street outside the hospital, and they both rode the elevator to the fifth floor of the hospital. Mr. Hunter waited while Defendant went into Mr. Morton's room and told him she was leaving for the day. Mr. Hunter and Defendant left the hospital and went separate ways. Mr. Hunter retrieved the insulin and two syringes from his car. He filled one of the syringes with 100 cc of insulin and the other syringe with 80 cc of insulin. Mr. Hunter returned to Mr. Morton's room and inserted the syringe with 80 cc into Mr. Morton's I.V. Mr. Morton screamed, and Mr. Hunter ran out of the room and down the stairway. He emptied the other syringe in the stairwell. Mr. Hunter said a nurse spotted him on the street, and he was apprehended by two of the hospital's security officers.

Mr. Hunter said that he had never met Mr. Morton. He denied that he was in love with Defendant. He acknowledged that Defendant had visited him at Jonestown Elementary School, but he denied that he introduced Defendant to his secretary as "Mrs. Adams."

On cross examination, Mr. Hunter said that he had four syringes with him on April 29, 2003, but two of the syringes did not have needles. Mr. Hunter said that he had been certified as a nurse's assistant but was not trained in the administration of insulin, and he was not sure how much insulin was needed to kill Mr. Morton. Mr. Hunter said that he intended to inject both syringes into Mr. Morton's I.V. and he denied that the other syringe was intended for his fiancee. Mr. Hunter denied describing himself to Defendant as the "fixer upper," and denied telling her he belonged to an organization that committed acts of violence against people they did not like. Mr. Hunter said that he did not break out the headlights and tail lights of the cars of Defendant's sons. Mr. Hunter acknowledged that he asked Defendant for the names and addresses of five family members as collateral. Mr. Hunter said he knew Defendant was serious about asking him to kill her husband when she gave him the names. He acknowledged that Defendant did not make him attempt to kill her husband. On redirect examination, Mr. Hunter said that he never forced Defendant to do anything she did not want to do.

Warren Nance testified that he had known Mr. Hunter for a number of years. Mr. Nance, who was diabetic, said that Mr. Hunter asked him for some insulin in April 2003. Mr. Nance said that he assumed Mr. Hunter was also diabetic and gave him one vial of insulin. Mr. Nance said that he did not give Mr. Hunter any syringes or needles. He stated that a prescription was needed to get needles.

Sergeant Ernestine Davidson with the Memphis Police Department interviewed Defendant on April 30, 2003. She read Defendant her *Miranda* rights, and Defendant executed a written waiver. Defendant gave a written statement which was read into the record. Officer Davidson asked Defendant if she was responsible for the assault on Mr. Morton. Defendant replied, "Indirectly, I would say yes, but directly I didn't do it because I wasn't there." Defendant said that Mr. Hunter, whom she identified as an acquaintance, called her on April 28, 2003, and told Defendant to call him "once everything was over" so that he would "know what [he] needed to do." Defendant said that she interpreted the phrase "what he needed to do" as "killing her husband," but she said that Mr. Hunter did not tell her any specifics. Defendant said she called Mr. Hunter after the surgery and told him that Mr. Morton had been given a sedative and an I.V. Mr. Hunter called back thirty to forty minutes later, and Defendant met him at the entrance to the hospital's emergency room. Defendant told Mr. Hunter that Mr. Morton was in Room D512.

Defendant said in her statement that she then drove away from the hospital. She received a call from a nurse sometime after 7:00 p.m., telling her that someone had tried to insert something into her husband's IV. Defendant stated that she did not think that Mr. Hunter was actually going to try to kill her husband.

Defendant said in her statement that she had previously told Mr. Hunter that she was having marital problems, and Mr. Hunter told her he was "the fixer upper." Mr. Hunter told Defendant that if she had an insurance policy with a face value of $100,000, all she would have to pay him was $38,000, and he would "take care of the rest." Defendant said she did not think Mr. Hunter was serious because he was laughing when he said that.

In her statement, Defendant said she met Mr. Hunter at an athletic banquet in the spring of 2002. Defendant acknowledged that she and Mr. Hunter had engaged in sexual intercourse once. Defendant said that she did not know who shot her husband in December 2002, but someone called her after the shooting and told her that her husband "got exactly what he deserved for f___ with my wife."

Defendant denied in her statement that she gave money in advance to Mr. Hunter to kill her husband. When questioned as to whether she asked Mr. Hunter to kill her husband, Defendant responded, "No, he put it out on the floor that he was the 'fixer upper.'" Defendant said she gave the names of five family members to Mr. Hunter "in the event he needed to get in touch" with her. When asked if she wanted her husband killed, Defendant replied, "In all actuality, no."

Sergeant Davidson said that Defendant gave a second statement on May 1, 2003, after again waiving her *Miranda* rights. In this statement, Defendant admitted that she agreed to pay $38,000 to Mr. Hunter to kill her husband. Defendant said Mr. Hunter came to the hospital on April 29, 2003, for that purpose, and Defendant told him her husband's hospital room number. When asked why she did not report Mr. Hunter's plan to someone, Defendant responded, "I really don't know. I don't know why I didn't tell somebody about the possibility of this might be happening. I guess

I just wanted it to be over." Defendant stated in her statement that she and Mr. Hunter last talked about killing her husband on April 29, 2003.

On cross-examination, Sergeant Davidson acknowledged that she did not ask Defendant if Defendant was scared of Mr. Hunter. Sergeant Davidson said Defendant expressed concern over Mr. Morton, but she denied that she promised Defendant that Defendant could see Mr. Morton if she gave a written statement to the police.

The defense then presented its proof. Brenda Johnson, Defendant's first cousin, testified that Defendant was with her on May 12, 2002. Ms. Johnson said her mother had a stroke that day, and she called Defendant to come stay with her at the hospital. Defendant arrived about 10:00 a.m. on May 12, 2002, and did not leave until 4:00 p.m or 5:00 p.m. the next day.

Defendant testified that she first saw Mr. Hunter at a school athletic banquet on May 3, 2002. Defendant said she spoke briefly with Mr. Hunter but did not exchange any information with him or pass him a note asking him to stay at the banquet. Defendant next saw Mr. Hunter at an awards ceremony at Jonestown Elementary School where her son's stepdaughter was a student. After the program, Mr. Hunter walked past her and nodded. He came back in a few minutes, and he and Defendant exchanged some comments.

A few days later, her son, Jeremy, came home from a date with Mr. Hunter's stepdaughter, and told Defendant that Mr. Hunter wanted Defendant to call him and that it was urgent. Defendant waited several days before returning the call. Mr. Hunter said that he wanted to "hookup" with Defendant. Defendant told Mr. Hunter, "No."

The next contact occurred a few months later in the summer. Defendant said Mr. Hunter called her on her cell phone and again asked if they could get together. Defendant refused again, and Mr. Hunter described certain details her family's routines, including the types of cars each family member drove. Mr. Hunter called back and told Defendant that he was in an organization, and that "he and his brothers in the organization knew everything there was to know about [Defendant's] family." Defendant said that Mr. Hunter told her that the organization expected people to do what they asked, and, if they did not, "certain things would happen to them as well as anyone that was close to them." Mr. Hunter described incidents of people being shot or killed, and their houses burned, if they did not cooperate with the organization.

Defendant said she was scared not to meet Mr. Hunter as he requested. She met Mr. Hunter once at the Lady Luck Casino and again at the Gold Strike Casino. Defendant said that Mr. Hunter forced her to have sex with him at the Gold Strike Casino.

Defendant said Mr. Hunter called her on her cell phone after her husband was shot in December 2002, and asked if he could do anything to help. Defendant refused his assistance. He called again the following week, and Defendant again refused his offers of help. About this time, the headlights and tail lights of the car belonging to her son, Richard, Jr., were broken.

Defendant said that between February 2003, and April 2003, Mr. Hunter would call her on her cell phone about three times each day. On one occasion, he told Defendant that he knew she was having marital problems, and he could send her husband "to the Bahamas for a little while or permanent[ly]." Defendant told him that she did not understand. Mr. Hunter said he was known as the "fixer upper because he believe[d] in fixing problems that occurred in homes."

Defendant said that she went to the police station to apply for a dispatcher job. Mr. Hunter called her and told her she had been disobedient, and he had "to make a believer out of her." The headlights of Jeremy Morton's car were broken shortly thereafter. Defendant said Mr. Hunter told her that she should report her daily schedule to him so that her family would be safe.

Defendant said her last "face-to-face" meeting with Mr. Hunter occurred in late February or early March 2003. Mr. Hunter told Defendant he was falling in love with her and again told her she had to cooperate or something would happen to her family members.

A week before April 29, 2003, Defendant said she got a call from her husband's doctor about scheduling surgery. Defendant did not tell Mr. Hunter, but he knew about the planned surgical procedure. Mr. Hunter told Defendant his fiancee was also having surgery on that day, and he "could take care of two birds with one stone." Mr. Hunter told Defendant to give him $38,000, and Defendant agreed because she was scared. Defendant said, however, that she never gave Mr. Hunter any money because she "didn't have anything to give him."

After her husband's surgery, Defendant said Mr. Hunter called her and told her to let him know when Mr. Morton had been moved from recovery to a private room, and Defendant did so. Defendant said Mr. Hunter asked about cameras and security in her husband's room, but Defendant did not understand what he was asking. Defendant told Mr. Hunter that the nurses's station was across from Mr. Morton's room.

When she went outside for a cigarette break, Mr. Hunter was standing by the hospital's emergency room doors. Mr. Hunter received a call on his cell phone, and he told the caller that he had "it under control." While he was on the call, Mr. Hunter asked Defendant to take him to her husband's hospital room, and Defendant refused. Mr. Hunter told the caller "to be on standby." Defendant and Mr. Hunter went up the elevator to the fifth floor. Defendant told Mr. Hunter that Mr. Morton was in Room D512, but she refused to take him to the room. Mr. Hunter checked out the room by himself, and then they rode back down the elevator to the ground floor. Mr. Hunter told Defendant he would be back, and Defendant told him she would not be there when he got back because she was going home.

Defendant said that she thought her husband would be safe because his room was across from the nurses' station, and nurses and doctors were always in the hall. Defendant said a nurse from the hospital called her on her cell phone after she had stopped for gas and told her to come back to the hospital.

Defendant said she thought she was helping the police investigation when they escorted her to the police station around 10:15 p.m. the night of the incident. Defendant said that her interview, however, did not begin until 3:30 a.m. or 4:00 a.m. Defendant said that she did not sleep or have anything to eat before her first statement was taken on the afternoon of April 30, 2003. Defendant told Sergeant Davidson that she was indirectly responsible for the incident because she had been afraid something would happen to her family if she told someone about Mr. Hunter. Defendant said that Mr. Hunter never told her directly that he was going to kill her husband; he just said that "he fix[ed] things that are broken."

## II. Corroborating Testimony

Defendant argues that Mr. Hunter's testimony, as Defendant's accomplice, was uncorroborated, and, without such corroboration, there was insufficient evidence to support Defendant's convictions.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 76 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Mr. Hunter was indicted with Defendant on the charges of attempted premeditated first degree murder and conspiracy to commit premeditated first degree murder. The trial court severed Mr. Hunter's case prior to Defendant's trial, and he ultimately pled guilty to the charged offenses. This is sufficient to establish Mr. Hunter as Defendant's accomplice. *State v. Allen*, 10 S.W.3d 286, 289 (Tenn. Crim. App. 1999) (Witness who pled guilty to same crime of which the defendant was charged was an accomplice); *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (Witness who was jointly indicted with the defendant and pled guilty was an accomplice).

It has long been the rule in Tennessee that a defendant cannot be convicted on the uncorroborated testimony of his or her accomplice. *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004) (citations omitted). As our Supreme Court has instructed:

There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction.

*State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)).

Some of the details of Mr. Hunter's testimony were corroborated by Ms. Patton whose testimony of how Mr. Hunter was apprehended matched Mr. Hunter's version, as well as Mr. Nance's testimony that he provided the insulin to Mr. Hunter. Defendant argues, however, that the only evidence offered by the State to corroborate Defendant's participation in Mr. Hunter's plan to kill Mr. Morton came through Ms. Bee's testimony. Defendant contends that at best Ms. Bee's testimony only indicated that Defendant and Mr. Hunter knew each other prior to the offense, and did not implicate Defendant in the offenses. While we would agree that Ms. Bee's testimony, standing alone, is not sufficient corroboration to identify Defendant as a participant in the offenses, Defendant's own statements to Sergeant Davidson sufficiently corroborate Mr. Hunter's testimony. *See Anderson*, 985 S.W.2d at 17 (The defendant's own statements to the police provide sufficient corroboration); *State v. Spadafina*, 952 S.W.2d 444, 450 (Tenn. Crim. App. 1996) (By his own testimony, the defendant placed himself at the scene of the crime).

Finding sufficient corroboration of Mr. Hunter's testimony, Defendant's challenge to the sufficiency of the evidence becomes essentially a challenge to the jury's assessment of the credibility of the witnesses.

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3). "Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

As relevant to the case *sub judice*, first degree murder is defined as "a premeditated and intentional killing of another." *Id.* § 39-13-202(a)(1). A premeditated act is one done after the exercise of reflection and judgment, with the intent to kill formed prior to the act itself. *Id.* § 39-13-202(d). The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. *State v. Suttles*, 30 S.W.3d 252, 260 (Tenn. 2000). Circumstances from which premeditation may be inferred include the defendant's use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by a defendant of an intent to kill; the defendant's procurement of a weapon; a defendant's

-10-

preparations prior to a killing for concealment of the crime; and calmness immediately after the killing. *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

A defendant may be convicted of attempted first degree murder under a theory of criminal responsibility. *See State v. Crenshaw*, 64 S.W.3d 374, 383 (Tenn. Crim. App. 2001). One is criminally responsible for a crime committed by another if by acting "with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2). "To be criminally responsible for the acts of another, a defendant must 'in some way associate himself with the venture, act with knowledge that an offense is to be committed and share in the criminal intent of the principal in the first degree.'" *Crenshaw*, 64 S.W.3d at 384 (citations omitted). The defendant's criminal intent may be inferred from the defendant's "presence, companionship, and conduct before and after the offense." *State v. McBee*, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982).

"The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." T.C.A. § 39-12-103(a). "Conspiracy implies concert of design and not participation in every detail of execution." *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). It is not necessary that the offense which is the subject of the conspiracy actually be committed. Tenn. Code Ann. § 39-12-103(f). In order to support a conviction of conspiracy, however, the State must prove that an overt act in pursuance of the conspiracy has been committed by at least one member of the conspiracy. *Id*. § 39-12-103(d). Thus, in order to support Defendant's conviction, the State was required to prove that Mr. Hunter and Defendant entered into an agreement to commit first degree premeditated murder.

Viewing the evidence in a light most favorable to the state, Defendant and Mr. Hunter formulated a plan to kill the victim sometime in the summer of 2002 and discussed the plan off and on during the following months. Defendant agreed to pay $38,000 to Mr. Hunter to kill the victim. After the victim was scheduled for surgery in April 2003, Mr. Hunter developed a plan to kill the victim by injecting insulin into his I.V. On April 24, 2003, Mr. Hunter and Defendant met to coordinate their plans. On April 25, 2003, Mr. Hunter acquired insulin from a diabetic friend and stored the drug in his refrigerator until April 29, 2003. On April 29, 2003, Mr. Hunter called Defendant on her cell phone at the hospital and told her he was on his way. Defendant met Mr. Hunter on the street and escorted him to the fifth floor of the hospital. Defendant told Mr. Hunter that the victim was in Room D512, and Mr. Hunter surveyed the location of the room. Defendant and Mr. Hunter went back down to the ground floor, and Mr. Hunter left to retrieve the syringes and insulin. Defendant told the victim she was leaving for the day and left the hospital. Mr. Hunter filled two syringes with insulin, entered the victim's room, and began to inject the insulin in one of the syringes into the victim's I.V. The victim screamed, and Mr. Hunter ran from the room before he finished emptying the first syringe.

The victim's blood sugar level dropped drastically after Mr. Hunter was in his room, and continued to fluctuate for some hours. Dr. Bee testified that the victim's low blood sugar levels were characteristic of the injection of insulin into his blood stream, and that severely low blood sugar levels could lead to coma and ultimately death.

Based on the foregoing, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of attempted premeditated first degree murder under a theory of criminal responsibility. We also conclude that a rational trier of fact could find beyond a reasonable doubt that Mr. Hunter and Defendant entered into a conspiracy to commit premeditated first degree murder, and that Mr. Hunter completed an overt act in pursuance of the conspiracy. Defendant is not entitled to relief on this issue.

Defendant argues that the jury's assessment of Mr. Hunter's credibility was misguided. Defendant submits that after Defendant's trial, Mr. Hunter filed a post-conviction petition alleging that he suffered from mental disorders and was under the influence of crack cocaine at the time he entered his guilty pleas to the charged offenses. The gist of Mr. Hunter's allegations is apparently that his pleas of guilty were not voluntarily or knowingly made. Defendant acknowledges that Mr. Hunter's post-conviction petition is not before this Court, and admits that she is unable to find any law to support her argument. Nonetheless, Defendant contends that in light of these subsequent allegations of mental incompetence, Mr. Hunter's testimony cannot be considered in viewing the sufficiency of the evidence supporting Defendant's convictions.

Whatever Mr. Hunter's allegations in his post-conviction petition, they are just that, allegations. Not only is that proceeding not before this Court, *see* Tenn. R. App. P. 13(c), this Court is not a fact-finding body. T.C.A. § 16-5-108(a); *State v. Williams*, 52 S.W.3d 109, 121 (Tenn. Crim. App. 2001). Moreover, Defendant did not object to Mr. Hunter's competency as a witness at the time of trial, and this issue has thus been waived. *See* Tenn. R. App. P. 3(3), 36(a), Tenn. R. Evid. 601; *State v. Carruthers*, 35 S.W.3d 516, 576 (Tenn. 2000) (appendix) (Observing that not only did the defendant waive the issue of the witness's competency for purposes of appellate review, the witness, even if found to be mentally incompetent, could have testified as long as she was able to understand the obligation of the oath and had personal knowledge of the matter to which she testified).

The jury was in a position to view the witnesses, hear their testimony, and observe their demeanor on the stand. Specifically, the jury was provided with Defendant's statements to Sergeant Davidson on April 30, 2003, and May 1, 2003, and heard Defendant's testimony at trial. By their verdict, the jury obviously resolved any conflicts in favor of the State, as was their prerogative, and this Court will not reweigh or reevaluate the evidence presented. Defendant is not entitled to relief on this issue.

-12-

## III. Sentencing Issues

Defendant argues that the trial court erred in not sentencing her as an especially mitigated offender instead of a Range I, standard offender. Defendant did not include a transcript of the sentencing hearing in the record for our review. Rule 24(b) of the Tennessee Rules of Appellate Procedure provides that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Because of this failure, we are unable to review this issue. "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." *State v. Oody,* 823 S.W.2d 554, 559 (Tenn. Crim. App.1991). Defendant is not entitled to relief on this issue.

## IV. Lesser Included Offenses

Defendant argues that the trial court erred in not charging the jury on solicitation of premeditated first degree murder as a lesser included offense of attempted premeditated first degree murder. The State contends that Defendant has waived this issue by failing to include it in her motion for new trial. *See* Tenn. R. App. P. 3(e). We initially observe, however, that at the time of Defendant's trial, absent a written request for an instruction on lesser included offenses, the failure of the trial court to instruct the jury on any lesser included offense is not available as a ground for relief either in a motion for new trial or for plenary review on appeal. T.C.A. § 40-18-110(c)(2002); *State v. Page*, ___ S.W.3d ___, 2006 WL 300980, *5 (Tenn. 2006).

During a hearing outside the presence of the jury concerning the proposed charges to the jury, the following discussion occurred:

> [TRIAL COURT:] Criminal attempt murder first degree, the conspiracy to commit murder in the first degree, there – because of the testimony are no lessers [sic]. And from both the State and the defense's theory, there are no lessers [sic]. Certainly juror's taking notes, just other standard charges, expert witnesses, and that. Anything else from the State?
>
> [PROSECUTOR:] Yes, sir. We're asking for a charge of criminal responsibility.
>
> [TRIAL COURT:] Okay. Anything else?
>
> [DEFENSE COUNSEL:] I can't think of anything else.

The offense of solicitation is defined as follows:

Whoever, by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation.

T.C.A. § 39-12-102(a). Solicitation is an offense two classifications lower than the charged offense, or, in the case *sub judice*, a Class C felony.

Under the test adopted in *State v. Burns*, 6 S.W.3d 453, 466-67 (Tenn. 1999), an offense is a lesser-included offense if:

(a) all of its statutory elements are included within the charged offense; or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing:
> (1) a different mental state indicating a lesser kind of culpability; or
> (2) a less serious harm or risk of harm to the same person, property or public interest; or
(c) it consists of facilitation, attempt or solicitation of the offense charged.

*Id.* at 466-67. In *Burns*, our Supreme Court concluded that solicitation is a lesser included offense of premeditated first degree murder under part (c). *Id*. at 471.

If an offense is a lesser included offense of the charged offense, the trial court must then determine whether the record contains any evidence which reasonable minds could accept as to the lesser included offense, and whether the evidence is legally sufficient to support a conviction of the lesser included offense. Tenn. Code Ann. § 40-18-110(a). In making these determinations, the trial court must consider the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of such evidence. *Id*.

Based on the foregoing and our review of the evidence presented at trial, we conclude that the evidence could legally support a conviction of solicitation of premeditated first degree murder. Both Mr. Hunter and Defendant in her May 3, 2003, statement to the police acknowledged that Defendant agreed to pay Mr. Hunter $38,000 for killing her husband. Mr. Hunter developed the method of killing the victim and procured the necessary supplies. Defendant was not present when Mr. Hunter attempted to carry out the plan. Although there was certainly conflicting evidence as to the role Defendant played in the commission of the offenses, the evidence could support a finding that Defendant solicited the murder of her husband.

Our Supreme Court has recently concluded that issues concerning jury instructions which were not requested in writing at the time of trial pursuant to Tennessee Code Annotated section 40-18-110(c) may still be reviewed on appeal if the instructions contain plain error. *Page*, 2006 WL

300980, at *6. Thus, before granting relief, we must determine if the omission of the challenged instruction rises to the level of plain error.

Rule 52(b) provides that "[a]n error which has affected the substantial rights of an accused may be noticed at any time even though not raised in the motion for new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." "Plain error review extends only to a clear, conspicuous, or obvious error which affects the substantial rights of the defendant." *State v. Gomez*, 163 S.W.3d 632, 645 (Tenn. 2005). A "substantial right" is a right of fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Five factors must be considered in determining whether an error is plain:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused [must not have waived] the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

*Id*. at 641-42 (citing Tenn. R. Crim. P. 52(b)).

The record must support the presence of all five factors; the absence of only one factor precludes further consideration. *State v. Smith,* 24 S.W.3d 274, 283 (Tenn. 2000).

Regarding application of the plain error doctrine as it relates to the issue involving failure by the trial court to charge an appropriate lesser included offense when the defendant fails to make a written request for the charge, our Supreme Court has concluded that a defendant must affirmatively show that the issue was not waived at the trial court for tactical reasons:

> In the present case, at trial, the defendant failed to request a lesser-included offense instruction of facilitation of second degree murder. The defendant has failed to show that he did not waive this issue for tactical reasons. Therefore, the trial court's failure to instruct on facilitation of second degree murder does not rise to the level of plain error.

*Page*, 2006 WL 300980, at *6.

Defendant's theory at trial was that she did not intend to murder her husband and that she did not hire Mr. Hunter to do so. The thrust of Defendant's testimony, which contradicted her pre-trial statements to the police, was that she became embroiled with Mr. Hunter's plan only because she was terrified of him and afraid that Mr. Hunter would harm her family if she did not cooperate.

Defendant in the case *sub judice*, as the defendant in *Page*, failed to show that she did not waive the issue for tactical reasons. The trial court's failure to instruct the jury on solicitation as a

lesser included offense of premeditated first degree murder does not rise to the level of plain error. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE